# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52852-5-II |
| Respondent, | |
| v. | |
| GEORGE FREDERICK JONES, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — A jury convicted George Jones of violating a no-contact order, a felony. Jones argues that the trial court violated his right to a unanimous jury verdict by failing to issue a unanimity instruction and it violated his right to confrontation by admitting testimonial statements from a witness who did not appear at trial. We affirm.

## FACTS

On March 2, 2016, the Lewis County Superior Court issued a no-contact order prohibiting Jones from contacting VN.

On September 15, VN visited Jones's home in Rochester. After arriving, VN and Jones had an argument. VN called 911 to report a no-contact order violation. Thurston County Deputy Ryan Hoover responded. Dispatch informed Hoover that, per information provided by VN, he was being dispatched for a "protection order violation" and looking for VN and Jones. 1 Report of Proceedings (RP) at 132.

Upon his arrival, Hoover made contact with VN, who appeared "[s]omewhat apprehensive" and "a little bit scared to start to talk" to him. 1 RP at 140. When Hoover inquired as to Jones's location, VN stated that "he had probably left to Olympia." 1 RP at 140. When Hoover pointed out that Jones's car was still at his home, and asked what vehicle Jones had taken, VN "lowered her voice," "appeared nervous," and told Hoover "he's actually under the house watching us." 1 RP at 140-41. Deputies found Jones near the home's crawl space.

Hoover then spoke with Jones, who admitted to knowing about the no-contact order. According to Hoover, Jones further stated he and VN had been in the same vehicle earlier that day, and VN had told him that the no-contact order had been dropped. He had doubts that the order had been dropped. Jones also told Hoover that he had been under the house when Hoover arrived, but had panicked when he saw Hoover. Jones also described the situation with VN as he "caused a little bit of a ruckus and things hit the fan [with VN]." 1 RP at 146.

The case proceeded to trial. Jones disputed Hoover's claim that Jones told him he had ridden in a car with VN earlier that day, and testified that he had not seen VN that day until she came to his home. When he saw VN on his property, he told her to leave, and she began to yell at him. He admitted "there was a ruckus back and forth," and that he did not leave the property because he believed the police were on the way. 1 RP at 179. Jones also testified that VN followed him around the house as he attempted to get away from her.

VN, out of state at the time of trial, did not testify. Through a motion in limine, Jones sought to exclude all statements made by VN from evidence. The court ruled that certain statements by VN did not violate the hearsay rule, and admitted her statements as set forth above. It did not rule if the statements violated the confrontation clause. Hoover testified both as to what he had been told by the dispatcher and by VN.

In its opening statement, the State told the jury the evidence it expected to admit in support of the no-contact order violation:

> [Hoover] was dispatched to a call arising out of an address in Rochester belonging to Mr. Jones. And you'll hear that [VN] was at the residence and Mr. Jones was at the residence. And you'll hear—and you'll see the no-contact order that's—that was in place at that time, and you'll see that Mr. Jones having any contact direct or otherwise with [VN] is prohibit[ed] by that order.

1 RP at 129.

In closing argument, the State focused on Jones's knowledge that a no-contact order existed and that he should not have been at his home with VN present. In rebuttal closing, the State briefly mentioned Jones's alleged contact with VN earlier that day. The State argued, "Deputy Hoover said that Mr. Jones said that he'd been with [VN] earlier in the day, when he came home he caused a ruckus with [VN], that things hit the fan, and he admitted that he panicked when law enforcement was coming." 2 RP at 284.

The jury found Jones guilty of violating a no-contact order. Then, in a bifurcated proceeding, it found that he had two previous convictions for violations of a no-contact order, which made the present crime a felony. Jones appeals.

ANALYSIS

I.      UNANIMITY JURY INSTRUCTION

As an initial matter, Jones did not ask the trial court to provide a unanimity jury instruction or object to the trial court's failure to do so. We generally do not review objections to jury instructions raised for the first time on appeal unless the party claiming the error can prove an exception to that rule, such as a manifest error affecting a constitutional right. RAP 2.5(a)(3).

To show a manifest error affecting a constitutional right under RAP 2.5(a)(3), we utilize a two-part test: "'(1) [h]as the party claiming error shown the error is truly of a constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?'" *State v. Grott*, 195 Wn.2d 256, 267, 458 P.3d 750 (2020) (quoting *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015)).

The failure to provide a unanimity instruction, if one is required, is a constitutional error. *State v. Locke*, 175 Wn. App. 779, 802, 307 P.3d 771 (2013). We review the requirement for a unanimity instruction de novo. *See State v. Furseth*, 156 Wn. App. 516, 520, 233 P.3d 902 (2010); *State v. Brown*, 159 Wn. App. 1, 14, 248 P.3d 518 (2010).

Jones argues that the court violated his right to a unanimous verdict by failing to provide the jury with a unanimity instruction. He argues that a unanimity instruction was required because the State alleged multiple acts that could have constituted a violation of the order prohibiting his contact with VN. We disagree with Jones.

Criminal defendants in Washington have a constitutional right to a unanimous jury verdict. WASH. CONST. art. I, § 21; *State v. Smith*, 159 Wn.2d 778, 783, 154 P.3d 873 (2007). If the State has presented evidence of multiple acts that could support a conviction on a single charged count, the jury must unanimously agree on which act constituted the crime. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988), *abrogated on other grounds*, *In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). If the State does not elect which act it is relying on to support the charge, the trial court must instruct the jury that all jurors must agree that the State proved a specific criminal act beyond a reasonable doubt. *Kitchen*, 110 Wn.2d at 411; *see also State v. Coleman*, 159 Wn.2d 509, 511-12, 150 P.3d 1126 (2007). "Multiple acts tend to be shown

by evidence of acts that occur at different times, in different places, or against different victims."

*Locke*, 175 Wn. App. at 802.

Here, in support of his argument that the State presented evidence of multiple acts, Jones relies on Hoover's testimony that Jones had told him that VN had driven Jones in her vehicle earlier that day, as well as the State's mention of Jones and VN seeing each other earlier that day during rebuttal closing argument. However, a review of the record supports the State's contention that it relied on a single act. The State consistently focused on VN's presence at Jones's home and that Jones had knowledge of her presence. The State's opening statement focused solely on VN's presence at Jones's home. The State's closing argument, prior to rebuttal, focused solely on VN's presence at Jones's home. Hoover did mention that Jones told him that he had also spent time with VN earlier that day, but the State did not rely on that information.

Accordingly, we conclude that the State did not present evidence of multiple acts that could support a conviction on a single charge, and that the trial court did not err by not giving a unanimity instruction. Because there is no constitutional error, Jones has not shown that he is entitled to review under RAP 2.5(a)(3).

II.    CONFRONTATION CLAUSE

Jones argues that the trial court's admission of multiple statements made by VN to others violated the confrontation clause when VN did not appear and testify at trial. We disagree.

The confrontation clause forbids admission of testimonial statements from a witness who does not appear at trial, unless the witness is unavailable to testify, and the defendant had a prior opportunity to cross-examine the witness. U.S. CONST. amend VI; WASH. CONST. art. I, § 22; *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). We review confrontation clause challenges de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

In the context of statements made to law enforcement, statements are nontestimonial when the primary purpose of the interaction is to enable police to meet an ongoing emergency. *State v. Koslowski*, 166 Wn.2d 409, 418, 209 P.3d 479 (2009) (citing *Davis*, 547 U.S. at 827). Statements are testimonial when there is no ongoing emergency, and the primary purpose of the interaction "is to establish or prove past events potentially relevant to later criminal prosecution." *Koslowski*, 166 Wn.2d at 418 (quoting *Davis*, 547 U.S. at 827).

In determining if a statement made to law enforcement is testimonial, we consider four factors.

> (1) Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant. (2) Would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the speaker was facing such an emergency. (3) What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were nontestimonial. (4) What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?

*Koslowski*, 166 Wn.2d at 418-19 (footnotes omitted).

In *Koslowski*, the victim called 911 to report a robbery. 166 Wn.2d at 414. When the police arrived, the upset victim began showing the officer ties that had been used on her as temporary handcuffs and where she had been forced to lay on the floor. She explained what had happened. *Koslowski*, 166 Wn.2d at 414. The court determined that the victim's statements were testimonial, because the victim was speaking about an incident that had already occurred, was no

6

longer in danger or dealing with a present emergency, and there was no evidence that the aggressor was still in the vicinity. *Koslowski*, 166 Wn.2d at 422-429.

Here, Jones challenges two sets of statements, those made by VN to police dispatch, as relayed to Hoover, and those VN made directly to Hoover.

A.  VN's Statements to Police Dispatch, as Relayed to Hoover[1]

Hoover testified that, on the date in question, dispatch sent him to Jones's home for a "protection order violation," to look for VN and Jones. 1 RP at 132. Hoover knew that VN had provided that information to dispatch.

Applying the first factor, VN described events as they took place and required police assistance. Applying the second factor, VN, a protected party, was in the presence of the person violating the protection order. A reasonable person would believe that the presence of someone in violation of a no-contact order presents a danger to the protected party. Applying the third factor, Hoover testified that he knew the location of the incident, and that it involved a no-contact order. He also knew the names of the two people named in the no-contact order. Those statements are objectively necessary for Hoover to respond to the emergency. Applying the fourth factor, the record provides little evidence, other than that there was "an argument" and "ruckus" between Jones and VN. It is reasonably assumed that a protected party being in the presence of a restrained party is neither tranquil nor safe.

Accordingly, we conclude that VN's statements during her 911 call to police dispatch, as relayed to Hoover, were nontestimonial. Their primary purpose was to enable police to respond to an ongoing emergency.

---

[1] As mentioned above, the trial court ruled that these statements were not being offered for the truth of the matter. The trial court did not instruct the jury as to what purpose it could use the statements, and the parties did not request such an instruction.

B.      VN's Statements Directly to Hoover

Jones also challenges the admission of statements VN made directly to Hoover after he had arrived at Jones's home. When Hoover asked VN about Jones's location, VN told him "that he had probably left to Olympia." 1 RP at 140. When Hoover pointed to Jones's car and asked what vehicle he had left in, VN told Hoover "he's actually under the house watching us." 1 RP at 141. Hoover noted that VN initially appeared "apprehensive" and "seemed a little bit scared to start to talk to me." 1 RP at 140. When Hoover asked what vehicle Jones had left in, she "lowered her voice" and appeared "nervous." 1 RP at 140-41.

Applying the first factor, VN described events as they occurred and while the protection order violation was still happening. She required police assistance. Applying the second factor, VN was in the presence of a restrained party in a no-contact agreement. She was actively seeking assistance from police. A reasonable person would believe that the presence of someone in violation of a no-contact order presents a danger to the protected party. Applying the third factor, VN replied to a question by Hoover regarding Jones's present location. The fact that VN's first response was an obvious lie, combined with her nervousness and apprehension, only intensified Hoover's need to ascertain Jones's location and resolve the emergency. As to the fourth factor, the interaction occurred as law enforcement searched for Jones. The environment was neither tranquil nor safe.

Accordingly, we conclude VN's statements to Hoover were nontestimonial. Because the trial court did not err in admitting VN's statements, Jones's confrontation clause argument fails.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Lee, C.J.

_____
Glasgow, J.